Case is submitted. We'll move to the second case, 23-13, 537, United States v. Adams. All right. We have Mr. Grubman here for the appellants, Mr. DeSink for the appellee. Mr. Grubman, whenever you're ready. Did I pronounce that correctly, Grubman? Yes, Grubman. Very good. Thank you so much, Your Honor. May it please the Court. Scott Grubman on behalf of the appellants, Dr. Adams and his medical practice. As this Court knows, the False Claims Act is rarely litigated. This is one of the rare cases that were litigated to verdict. Unfortunately, for us, that verdict was in favor of the government. The jury returned the verdict for $1.1 million. Thereafter, the Court applied statutory trouble damages and proclaimed penalties and issued a final judgment of just over $27.5 million, which is just about 25 times the amount of the jury verdict. Now, I know we filed a lengthy brief. We have a lot of issues on appeal. Obviously, I'll do my best to answer any questions the Court has. I would like to focus on the Daubert issue, which I think is the most substantive and, quite bluntly, the most fruitful for us. Can you first answer, and maybe I just didn't get this from the record, but at any time did Dr. Adams indicate that he engaged in a different physical evaluation or analysis of the 4,400 people that would somehow undermine reliance on the 67? Yes, Your Honor. Well, I think, so you're asking a question about the statistical sampling and extrapolation. Yes, Dr. Adams testified, I think, multiple times in his deposition and at trial. He actually was deposed twice, and then he testified at trial, so we have three pieces of testimony. And he testified multiple times, and Dr. Bourne, our expert, did as well, that each patient has to be treated individually on a patient-by-patient basis. For example, Dr. Adams and Dr. Bourne testified that there are times where a urine test or a blood test or however you want to test a patient might not indicate an excess level of lead, but a history and physical, which is just kind of the medical term for an office visit where the doctor's chatting with you and taking notes like we've all had, might indicate that chelation therapy is necessary. Here's the problem with that. Dr. Adams said at trial, I don't treat patients for lead poisoning, right? So I don't see any statistical sampling. What I see, and tell me if this is incorrect, is that the government relied on the following syllogism. One, the FDA label for EDTA says that it should be used only for the treatment of lead poisoning, acute and chronic, and lead encephalophthalo... I can't pronounce it either. Two, Medicare prohibits submitting claims for off-label uses of drugs. Three, Adams testified at a deposition that he has never treated anyone for heavy metal toxicity, and he said at trial, I don't treat patients for lead poisoning. Four, therefore, all of Adams' claims were false. Why is that wrong? So it's three. And nothing you said is wrong, Your Honor. It's the, that the whole case, you have to look at it in context, was a disagreement about what those terms meant. Lead poisoning, lead toxicity. Dr. Adams, and this I know sounds silly to us, but Dr. Adams was very insistent throughout all his testimony that what he treats is something called excess body burden of heavy metal, excess body burden of lead. I will sit here in my place, Your Honor, and say, I think that's the same thing as heavy metal toxicity. But Dr. Adams doesn't, apparently, and neither does Medicaid and Medicare, so... He, he, he actually does believe, if you look at the, um, the totality of his testimony, he says over and over and over, even minuscule amounts of lead in the human systems have toxic effects. Well, then why did he change, I think it was 2008 is the trigger date, then why did he change his analysis, his diagnosis, his lab report requests? All of that changed after this conference when he found out that he could get Medicare money for this. And, and it very well might have, and with all due respect, Your Honor, I would say that's okay. If you go to a conference and you find out, hey, you know what, this treatment that you've been giving all these patients that you think is so great, turns out they don't have to pay for it out of pocket, they can have help by Medicare. But no, that's not what happened. What happened is you can get help from Medicare if you label it this way, if you use this certain code, if you order this certain type of lab testing and that's what the facts of this case show. Well, yes, Your Honor, but all of that is just the reality of health care billing. You give a treatment that Medicare specifically doesn't approve for what you've traditionally been diagnosing it for, that is not a win for anyone when you're billing the federal government millions of dollars to provide this unproven treatment that for whatever reason you may or may not think is worthwhile, but the government and its regulations doesn't agree. How is that a win for anyone? I disagree with you. I think the entire trial was about the regulations. I do see that you read the government's interpretations of the regulations. The regulations do not actually say that. As we stated in our brief and as we presented at trial, the regulations actually don't say anything about this particular area. For example, the government's expert, and this is where we get back into experts, so try to kind of weave this in as well, the government's expert says exactly what you're saying. I agree. They say chelation therapy is only medically necessary when you have a blood test and when the results of that blood test is X number of milliliter, you know, whatever the measurement is, 50 on the blood test or above. The government says unless you have that, which they call an acute exposure to lead, like and literally at trial, the government said this is what's called emergency room levels of lead, meaning you're being rushed to Grady right now to get treatment. According to the government, you're absolutely right. That is the only time. However, and this is where we get to our Daubert issue. According to Dr. Bourne, who was excluded from testifying, we think erroneously, we think that was clear error. According to him, blood tests, they reject the entire premise of a blood test. And this is what this case came down to, Your Honor. Doesn't the government get to decide what the government covers? No. Well, the government gets not, not Mr. DeSink at trial. Government does get to decide at some point when they're writing the regulations. But just like everything else, the regulations have to be clear. They have to put folks on notice. It's not like the government gets to decide when they sit up at each trial and say, what's going to be our our theory in this case? But we decide in this case that this is the standard. So Medicare, Medicare covers a disease called chronic pain syndrome. And Oxycontin is sometimes used to treat that ailment. Can a doctor say, well, you know, everyone's got long lasting aches and pains. So in my view, everyone has chronic pain syndrome. So I'm going to prescribe Oxycontin to everyone. Would that be an allowable charge to Medicare in your view? I don't know. But Dr. Adams did not say that. So, so is that is that any different than what he's saying? Very different, Your Honor, in my respect. So you, in your hypothetical, someone saying I get to give this dangerous drug, pain drug to patients just because they want it. In our situation. No, my, no, my, my, that's not my hypo. My hypo is every patient has some level of aches and pains. And I interpret that as chronic pain. Right. And so therefore, I give every patient Oxycontin. And they all love it. They think it's great. They give me good reviews. Why is that any different than what's happening here? Because that's not at all what happened here. What happened here is Dr. Adams testified frequently and Dr. Bourne, as I keep getting back to Dr. Bourne, attempted to testify that in order to determine on the patient by patient basis whether chelation therapy is appropriate, you have to do the following. You have to do a urine, a provoked urine test. So that's the first distinction between your hypothetical, Your Honor, is that Dr. Adams said, I do a provoked urine test. And Dr. Bourne, in his proposed expert testimony, said that is, in fact, the appropriate test to do. The reason for that, Your Honors, and is not because it's some trick to get Medicare to pay. Here's what the medical experts say. And they cite peer review journals. And if I have a few minutes, I could cite some of them. Well, is this the place for us to debate whether or not the government is correct in its decision whether or not to cover this chelation therapy? We're just here because the regulations were as they were. The language was defined as it was. And Dr. Adams decided to, it seems, the district court agreed, stretch the rules. And maybe some wouldn't say even stretch, go straight outside of them. So I don't know, in terms of where your argument is going, if that's the proper discussion for us to have. At this case, we're kind of stuck with how the government defined when this treatment is necessary. Dr. Adams admitted that none of the 4,400 people were dealing with this high level of lead. And therefore, I guess I'm still interested in why isn't it enough, based on his testimony, to look at 67 of a line fraud? I don't believe it was enough. But even if it was enough, Your Honor, it was reversible error only. And it wasn't the district court, respectfully, Your Honor. It was a jury. And as this court said in the last argument, it is the jury that gets to decide. In this case, the jury did not hear from our medical expert. In 2019, this court issued a very seminal case of false claims act jurisprudence called the SARA CARE. And in that case, this court recognized that there are a lot of false claims act cases which come down to a disagreement as to medical necessity. And that's okay. That is a legitimate theory that this court has recognized. However, because this case was about medical necessity, and because the jury heard from Dr. Ollins, the government's expert, who said, in my expert opinion, these tests were not medically necessary. Okay. That's a legitimate opinion. And it was allowed to be presented to the jury. Dr. Born, licensed physician, medical doctor, cites peer-reviewed articles like the Journal of the American Medical Association. Like the — Did he cite those in his — in his expert materials? He doesn't have to. He — the law is clear that the court views both the expert report and the depositions. He cites some of them in the expert report, yes, Your Honor, but even more in the deposition. And if you'd like, I could give you just a few pinpoint sites for your review later. At, for example, page 102, it's on the record, volume three, tab eight, which is his deposition, Dr. Born's page 102. He talks in very great detail about why blood tests are not the appropriate measure. See, this is the problem, Your Honor. Did he cite any studies to support that? Yes, he did, Your Honor. He cited studies. He cited the CDC recommendations as to the levels of lead in children, and he notes, for example, he says, look at the CDC recommendations for lead in children. It's a lot lower for adults. So, for example, that's one example — Right, but does that — why does that study say that what your client did is correct? Because it's a — it's one example as to — and let me give you another example. He talks about the fact that half-life of lead in the blood is very, very short. He goes into very specific detail as to why just measuring lead by a blood test is not appropriate because of the very short half-life. So that — there's the problem, Your Honors. I believe is that the questioning at his deposition was very, very craftful by a very, very experienced, great attorney saying, well, what about these blood tests? What about these blood tests? In response, he rejected the entire premise of the blood test. He said, blood tests aren't the proper measure. Instead, the proper measure is provoke urine tests and history and physical of the patient. And then when he was told that Dr. Adams did not do those tests, he said chelation therapy would still be appropriate because he, quote, trusts that Dr. Adams has the patient's best interest in his clinical decisions. Is that the kind of expert analysis that really a jury needs to hear? So that's what it says in the brief. But if you read the entire deposition and you read that quote in context, it actually — it says that as a quote, but then you read it. And here's what he says. He says, when you go into a history and physical at a doctor's office, I — me, the doctor, Dr. Bourne — and keep in mind, he had years of experience performing chelation therapy on his patients. And that is — 703 allows that to be the basis for an expert opinion. He says, if I see you as my patient and I determine based on my history and physical that you need chelation therapy, then I send a test off to be done. Now, keep in mind, Your Honors, lab tests take a little while to get back. His point was, if I don't give you that treatment now, the moment I determine based on my experience that you need it, I am not being ethical. And he uses that word in his deposition, ethical. So, yes, he did say that quote, but that is not — clearly not what he meant. The rest of your testimony does not make it seem more reliable, because if that's the standard, if all any False Claims Act physician has to do is find a doctor who says that I look at the whole patient and figure out that this is what they need, then there will never be another False Claims Act conviction in the federal courts. If that's all it takes, then this act is a dead letter. Could I answer just that one question? I will say this. That could have very well been a reason why the jury, which, as you said in the last argument, we trust that this ultimate decision is jury, if the jury wanted to compare Dr. Bourne's testimony, which they may have viewed as weak, and Dr. Olive's testimony, and throw out Dr. Bourne's — and, in fact, this court in U.S. v. Alabama Power in 2013 said, and I quote, that Rule 702 is not intended to supplant the adversary system. And then you all said, quote, even when the evidence is shaky. And so, Your Honor, with respect, maybe at work, accepting your argument — of course, I'm not arguing this — but accepting the premise of your argument, okay, Dr. Bourne's testimony may have been on a little shakier ground than Dr. Olive's, who was a, quote, you know, more mainstream physician. Under the United States v. Alabama Power, that's simply not enough. With that, I reserve the rest of my time. Thank you. Okay. Very well. Thank you, Mr. Crubman. Mr. DeSink, let's hear from you. Good morning, Your Honors. May it please the Court. I'm Assistant U.S. Attorney Anthony DeSink. I was lead trial attorney in the case below. In the trial, the government presented evidence that Dr. Adams was diagnosing his patients with conditions they did not have and that he was knowingly doing this in order to obtain reimbursement from Medicare for a service that Medicare otherwise would not cover. Now, the jury found him liable under the False Claims Act, and now on appeal, he primarily asked his court to find, contrary to what the district court found, that no reasonable jury could have found as this jury did. That's a very difficult standard, and it's one that he cannot meet. I'll start with falsity, even though it wasn't discussed too much in the opening argument. It was the primary focus of the briefs, and that was unusual and surprising because usually in False Claims Act cases, the battle is over materiality. The battle is over scienter. The Supreme Court, especially post-Escobar, has made falsity easier to prove. The court said that we should not approach these cases by circumscribing what it means to be false, but instead to focus on the scienter of the person. So in Medicare cases like this one, to enroll in Medicare, the provider has to certify that they will abide by Medicare's rules, and falsity is proven by showing that they're submitting claims for services that are not covered, or as this court put it in the R&F Properties case, if it is not reimbursable, quote unquote, then it's a false claim, or as the Ninth Circuit put it in the Winter v. Garden case, every Medicare claim carries with it an express or implied certification of medical necessity. So then it is appropriate for us to go behind the regulations and the definition and debate whether or not this was indeed necessary as opposed to false? So that's two sides of the same thing, Your Honor. So one of Medicare's rules is we do not cover services that are not medically necessary. That rule actually is imposed by Congress. It's one of the biggest limitations on what Medicare covers or doesn't cover, and Medicare has explained what that means. You know, for example, one of Medicare's rules that we cite says experimental treatments are not medically necessary. Dr. Adams told his patients on the informed consent forms that the treatment he was giving them was, quote, experimental and not accepted by traditional medicine doctors. You put those two things together, and that's sufficient to prove falsity. We gave four—we gave the jury four different reasons to think his claim was false. I think I refer to them as theories of falsity. I regret that word choice. It was more four different arguments of how you get to the factual question of was this claim false? And these claims were false. They were expressly false because right on the four corners, he listed diagnoses that were not true, and they were implicitly false because they violated his certification to abide by Medicare's rules. And those are factual determinations by the jury that we would have to find no reasonable jury could come to in order to overturn on that basis, right? Exactly, Judge Grant. So that shifts the burden then to materiality and scienter. That's usually where the fight is in these cases, but here the facts were very strong on both those issues. You know, on materiality, a government witness testified, we don't cover this. They have the national coverage determinations saying we don't cover this. The fact that those rules exist is somewhat proof that Medicare cares about this topic. There are longstanding prohibitions on covering chelation therapy. And then on scienter, you know, just the main evidence, I would say, is just the way that he changed in 2008 once he learned, oh, Medicare will cover this if my patients have lead poisoning. So he starts diagnosing his patients with lead poisoning, but he said at trial that, you know, lead poisoning, as used by most doctors, is an emergency condition. You know, that's not what his patients have. His patients have the same level of lead that he has. So, you know, I think that's a good point. Since that was a topic at the opening argument, you know, the district court, as you noted, Judge Grant gave two reasons for excluding Dr. Bourne. They both have to go to reliability, but two arguments about Dr. Bourne. Dr. Bourne's opinion in his expert report was, and I quote, that Dr. Adams' treatment of his patients using chelation therapy was medically necessary, end quote. And he does have a few citations to scholarly articles in that opinion. If those aren't in the record, I'm happy to provide them. None of those articles say anything like that. Those articles just say that lead is bad for you, which is not something that anybody's contesting. Of course lead is bad for you, but that does not mean that people with minute exposures to lead need this drug infused into their veins to treat that. Across the board, or is that the purpose of having a doctor to determine, make that individualized assessment in light of what else is going on with your body? So obviously a doctor on the ground has to make the call. Does this patient need chelation therapy or not? But that decision is informed by, you know, medical treatises, medical textbooks, scholarly understandings in the field. That's what our expert talked about was, when do you give a patient chelation therapy and when do you not? And on that Dr. Bourne's position was, I ask the patient if they want it and if they want it, I'll give it to them. I think it's unethical to not give patients treatments that they want. And whether it's indicated for that patient or not, he said, was just an arbitrary number made up by a committee. So the district court found that that was not a reliable approach to deciding what treatments are medically indicated and are not. And that was not an abuse of discretion, which is the standard here on appeal. And the last thing I want to mention, just because it will be new at the circuit level, is the issue of whether the jury should have been informed about the travel damages and the penalties that the judge imposes post-trial. There's a unanimous line of district court opinions saying that those should not be, the jury should not be informed about those. That's juries are not informed about post-trial consequences. There are lots of post-trial consequences in a Medicare case like this. Providers can lose their license if they're still a member of Medicare. The DEA, if it has to do with drugs, the DEA might revoke their registration. But we don't discuss those with the jury because that's not what the jury is there to decide. And this will be the first circuit court to address that topic. So I just wanted to give you a chance to ask any questions you had about it. Did the government rely on statistical sampling in this case? No, we did not. We relied on Dr. Adams' description of how he practiced chelation, that he basically does the same thing with every patient. He said on the stand that he thought everybody in the courtroom needed the treatment, having actually examined basically none of them. But he did this with all of his patients. And he also agreed that none of his patients had the high levels of lead that would be consistent with lead poisoning as that term is used in the medical community. So by him saying all and none, we did not need to use statistical. So what, tell us about the purpose of those, the review of those 67 records then. Well, you got to show the jury some actual patients. Say, this is what it looks like. Here's an actual lab test by an actual patient. So it served that purpose. The 67 patients were chosen by a statistician so that we could use statistical extrapolation if we needed to. But we did not end up needing to because Dr. Adams gave us the testimony that we needed. Got it. To support damages that covered the 4,400, even though the sample was only 67. So you did use that number in some significant way, nevertheless, correct? He summed up what he saw in the 67 patient files that he looked at. But to be clear, we did not ask the jury to conclude in some statistical method that therefore X percentage of the 4,407 were false. You know, those were just examples, randomly chosen examples, to be sure. But it was Dr. Adams' testimony that all the patients were treated this way, that none of them had genuine lead poisoning, that that's what allows us to get the whole 4,407. So these were examples to show that the paperwork was consistent with his testimony about his approach, which did not admit to any exceptions or anything, right? It was his universal approach for all the patients. Correct. And these examples were uniformly consistent with his testimony, right? Correct. And all 67, not a single one of them had a blood lead level above, I think it was six micrograms per deciliter, which is regular. What would be required for chelation therapy? So as our expert testified that chelation therapy, according to toxicology treatises and other textbooks, that you give chelation therapy when somebody has a blood lead level above 50 micrograms per deciliter and is exhibiting symptoms of lead poisoning, such as confusion, inability to use the fingers, things like that are when you want to get that patient in an emergency room and you want to give them chelation therapy, but not short of that. And that's rather extreme and rare circumstances. Are there risks to chelation therapy? Yes, there are risks to any drug. Both Dr. Olives and Dr. Adams talked about this, but there are, I mean, just any time you give a drug, and it is a serious drug, it grabs metal ions in your body, lead is a plus two metal ion, but so is calcium. So it can really strip calcium out of your body to the point where if you give too much, it can cause your heart to stop working, because calcium is what causes your heart to beat. So there are patients, not Dr. Adams' patients, but there are patients who have died from receiving chelation therapy. Thank you. Okay, very well, Mr. DeSink, thank you very much. Mr. Grubin, you've got two minutes of rebuttal time remaining. Respectfully, Mr. DeSink, I do think he proved my point as to the medical necessity. This was a case about medical necessity. One of the last things he said in response to Judge Grant's question was, as our expert testified. But the problem is, and yes, the jury's verdict, the jury made factual findings which have to be upheld on appeal, but what doesn't, that standard doesn't apply to the issue, the Daubert issue. That's an abusive discretion standard, and the jury's verdict should not be given weight because this was a case of medical necessity where they only got to hear one side. Did Dr. Bourne's report cite any studies that said you should give chelation therapy for these minor levels of blood metals? No, not exactly what you said, but he did cite on page 102 of his deposition, and Mr. DeSink said there's absolutely nothing out there standing for the fact that these minuscule amounts of lead are dangerous. That's what he said. On page 102, Dr. Bourne cites the National Institute of Health and the standards they have. That's a government agency, which he says, and this was his opinion that should have been allowed to put to the jury, which he says stands for the proposition that even small amounts of lead in the human body are toxic. So, yes. And to respond to your question about 2008, my wonderful co-counsel, Lauren Warner, helped me out with that one. The testimony showed, or the evidence showed at trial, that a woman named Cheryl Sweeney, who is a billing consultant that doctors go and hire, that was in 2008 is when he met Ms. Sweeney, and we believe the evidence shows that Ms. Sweeney informs him. Now, whether it was accurate or not is somewhat beside the point as we see her today, but that it was 2008 when Ms. Sweeney said, you are allowed to bill this. And it's not beside the point. Go ahead. I thought she said, or he had someone do an audit who said, you need to be careful about this billing. That's someone else. Ms. Sweeney was someone that was a consultant that would go around and that he, I think, testified met at a conference in 2008. And so... So, he had been told, as Judge Abudu points out, that this was a problem, and then he met Ms. Sweeney who said, hey, here's a way. I don't think that's beside the point. I think that goes And that's, I meant beside the point as to the Daubert issue. So, I'm sorry. I didn't mean that it was irrelevant. That is what the government's theory was. I understand that he found out how you, the government says what Dr. Adams did is he found out how you bill, and he just did that. I understand that's their argument. Our arguments, that's not what he did. He found out this service that I'm already doing that I, as a licensed medical professional, which as a reminder, attorneys aren't licensed medical. He's a licensed medical professional. He found out in 2008, oh, I could bill Medicare for this. I just have to make sure, and this happens all the time with healthcare clients. Remind me how much you billed Medicare for this. $1.1 million over about, I don't, it was a number of years, eight, nine, you know, the better part of a decade. He billed $1.1 million. And so, our- Well, checking off the boxes is different than filling in the blanks, which I think is the government's argument is what happened here. Yes, Your Honor. We, I think that's a perfect analogy. We do believe it was checking off the boxes. I do believe the government thinks it's filling in the blanks or maybe vice versa, but I do think that's a good analogy. With that, you gave me a lot of extra time. I appreciate it. Thank you. Very well. Thank you both.